UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MYRON HUFFMAN by and through his Attorney-In-Fact, MICHELLE WHITE, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:24-cv-01674-SEB-MKK |
| HANCOCK REGIONAL HOSPITAL d/b/a HOOVERWOOD d/b/a HOOVERWOOD, INDIANAPOLIS JEWISH HOME, INC., | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Myron Huffman ("Mr. Huffman") filed his complaint based on the Federal Nursing Home Reform Act ("FNHRA"), 42 U.S.C. § 1396r(c)(1)(A)(v)(I), enforceable under 42 U.S.C. § 1983, alleging that, due to a widespread custom of understaffing, Hooverwood failed to provide Mr. Huffman with reasonable accommodation of his individual needs and preferences in violation of the statute. Pending before the Court are Defendants Hancock Regional Hospital d/b/a Hooverwood ("Hooverwood") and Indianapolis Jewish Home, Inc.'s Motion for Summary Judgment, dkt. 69, which is fully briefed by the parties and now ripe for the Court's decision.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is proper when " 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). The moving party has the initial burden to establish the basis of the motion by directing the court to specific portions of the evidentiary record that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Id.* at 323.

Controlling substantive law determines what facts are material. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Summary judgment is still proper if the facts in dispute are not "outcome determinative." *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005) (citation modified).

The court must accept the moving party's facts as true, except to the extent that they are controverted in the "Statement of Material Facts in Dispute" submitted by the nonmoving party. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) (citing S.D. Ind. L.R. 56-1). Only facts adduced in support of or opposition to the motion, accompanied by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence," are considered. S.D. Ind. L.R. 56-1(e). The court need not "scour the record looking for factual disputes." *Waldridge*, 24 F.3d at 922. S.D. Ind. L.R. 56-1(h). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## BACKGROUND

### I. Procedural History

Mr. Huffman, by and through his daughter and attorney-in-fact, Michelle White, initiated this action on September 25, 2024. Dkt. 1. The operative Amended Complaint alleged fifteen FNHRA violations. Dkt. 17.

On June 25, 2025, we granted in part and denied in part Defendants' Motion to Dismiss. Dkt. 42. Plaintiff's sole surviving claim is that Defendants failed to provide him with reasonable accommodations of his individual needs and preferences under 42 U.S.C. § 1396r(c)(1)(A)(v)(I). Specifically, we ruled that Mr. Huffman's allegation that "he needed staff assistance with daily

care, that Hooverwood was understaffed, that this lack of staff prohibited Hooverwood from providing him with a reasonable accommodation of his individual need for consistent staff assistance, and this lack of assistance ultimately resulted in injuries from his unsupervised fall" was sufficient to state a plausible claim for relief. [1] Dkt. 19 at 9.

On January 23, 2026, Defendants moved for summary judgment on this remaining claim. Dkt. 69. On February 20, 2026, Mr. Huffman responded in opposition to the Motion for Summary Judgment, dkt. 73, and Defendants filed their reply on March 6, 2026. Dkt. 78. The summary judgment motion is thus fully briefed and ripe for ruling.

## II. Factual Background[2]

Relying on the material facts not in controversy and drawing all reasonable inferences in Plaintiff's favor, we address below whether summary judgment on Plaintiff's remaining claim is appropriate. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

### A. The Defendants

Hooverwood is long-term skilled nursing care facility owned and operated by Hancock Regional Hospital, whose daily operations are managed by the Indianapolis Jewish Home. Dkt.

---

[1] Mr. Huffman's original complaint included claims based on the Omnibus Budget Reconciliation Act of 1987 ("OBRA") and FNHRA. In our prior ruling on Defendants' Motion to Dismiss, we dismissed all the claims other than the one alleging a failure to reasonably accommodate Mr. Huffman due to Defendants' understaffing, pursuant to 42 U.S.C. § 1396r(c)(1)(A)(v)(I). Despite our rulings, Mr. Huffman has attempted to assert additional claims, arguing that his cause of action, in addition to understaffing issue, encompasses issues of "inadequate medical care . . . , improper budgeting, and fail[ure] to inform." However, Plaintiff's claim of failure to inform has been previously dismissed. Dkt. 10. As we have previously determined, Plaintiff's sole surviving claim is pursuant to 42 U.S.C. § 1396r(c)(1)(A)(v)(I). We shall limit our discussion accordingly.

[2] Plaintiff has filed a separate document in response to Defendants' Statement of Facts. Our Local Rules unambiguously require the nonmoving party to file a response brief with a section labeled "Statement of Material Facts in Dispute" in which the nonmoving party is to set forth those facts in dispute which they believe precludes summary judgment. S.D. Ind. L.R. 56-1(b). The purpose of this requirement is to facilitate the review of the parties' respective factual contentions. In the future, we expect this procedure to be followed by Plaintiff's attorneys.

92 at 8 n.2. Hancock Regional Hospital is a municipal entity, dkt. 70 at 6, organized under the statutes of Indiana. Pl's Am. Compl. ¶ 13, dkt. 17 at 3.[3] During the relevant time period, Hooverwood maintained policies supporting the creation of individualized care plans[4] which included fall risk assessments for all new residents. Dkt. 70 at 3. Pl.'s Ex. E., dkt. 73 at 92–95. Dkt. 74 at 11, 15. Pl's Ex. I at 51:10–52:16, 65:4–18, dkt. 73 at 152–153, 156. Pl's Ex. J, dkt. 73 at 159–160.

### B. Mr. Huffman's Admission to Hooverwood and his October 15th Fall

On October 13, 2022, Mr. Huffman was admitted to Hooverwood for post-surgical rehabilitation three days after having undergone (a successful) knee replacement surgery. Dkt. 70 at 2. Dkt. 17 at 18. Defs' Ex. E, dkt. 69-5 at 11–12. Dkt. 74 at 2. Two days thereafter, on October 15, 2022, Mr. Huffman suffered a fall while trying to maneuver himself from his bed to his wheelchair. Dkt. 70 at 2; dkt. 74 at 2. No person was present to witness Mr. Huffman's fall. Dkt. 74 at 3. After an unspecified period of time, a nurse aide found Mr. Huffman sitting on the floor next to his wheelchair. Dkt. 73 at 136. In her deposition, Mr. Huffman's adult daughter, Michelle White ("Ms. White"), testified on Mr. Huffman's behalf stating that his attempt to move himself was due to a delay in the staff response after he had engaged his bedside call light. White Dep. 36:7-12, dkt. 69-1 at 6. Ms. White further testified that on the day of her father's fall she herself had expressed concern to staff regarding her father's increased confusion. Pl's Ex. B, dkt. 73 at

---

[3] In their answer to Plaintiff's Amended Complaint, Defendants admit the allegation that Hancock Regional Hospital is a county hospital organized under the laws of Indiana. Defs.' Answer ¶ 13, dkt. 45 at 5.

[4] In his separately filed Response to Defendants' Statement of Material Facts, Plaintiff purports to dispute that Hooverwood had a policy of creating individualized care plans for all residents. Dkt. 75 at 2–3. However, in his response brief in Opposition to Summary Judgment, he acknowledges that Hooverwood maintained "policies requiring individualized care plans for each patient . . . ." Dkt. 74 at 11. We therefore regard Hooverwood's policy of creating individualized care plans for each resident as an undisputed fact.

33. His nurse had noted as well in Mr. Huffman's progress notes that he was confused and in need of constant redirection. Dkt. 74 at 3. Pl's Ex. B, dkt. 73 at 33. Pl's Ex. C. ¶ 9, dkt. 73 at 38.

Though the fall incident report indicated that Mr. Huffman had experienced no apparent injury due to his fall, dkt. 73 at 30; dkt. 74 at 3, three hours thereafter he was transported to Ascension St. Vincent Indianapolis hospital for treatment of his knee which had begun bleeding at the surgical site. Dkt. 74 at 3 ¶¶ 4–5. X-rays performed during this visit to St. Vincent's showed no "notable complications," dkt. 70 at 2; dkt. 17 at 20; Defs' Ex. A 36:5-22, dkt. 69-1 at 6; Defs' Ex. E, dkt. 69-5 at 9, but his medical records recounted that his fall had been the cause of his surgical incision reopening. Dkt. 73 at 22. Following Mr. Huffman's return to Hooverwood he found himself in need of additional bouts of emergency care due to the continued bleeding from his surgical site. Dkt. 74 at 3.

### C. October 25th Injury and Subsequent Amputation

On October 25, 2022, Mr. Huffman was transported to the offices of OrthoIndy in Indianapolis for a follow up appointment with the surgeon who had performed his knee replacement. Dkt. 70 at 2. Defs' Ex. E, dkt. 69-5 at 7–8. As he entered the lobby of the medical office, his left leg on which the knee surgery had been performed fell from the leg rest on his wheelchair where it had been positioned during transit. Dkt. 70 at 2. Defs' Ex. E, dkt. 69-5 at 7–8. When his leg dropped, Mr. Huffman felt a "pop" and a sudden increase in pain. Dkt. 70 at 2. Defs' Ex. A, White Dep., 20:22–21:21, 50:10–15, 51:10–15, dkt. 69-1 at 2–3, 9, 10. X-rays performed during that appointment revealed that his knee had been dislocated, requiring "repeat revision of the hinged knee components." Dkt. 70 at 2. Defs' Ex. E, dkt. 69-5 at 7.

On October 28, 2022, Mr. Huffman underwent a second surgery on his knee, dkt. 70 at 3; dkt. 17 at 22–23, following which his knee became infected. Dkt. 70 at 2; dkt 17 at 22–24. Ultimately, due to the infection, Mr. Huffman's leg required amputation. *Id.*

Mr. Huffman avers that, despite Hooverwood's policies, he never received an individualized care plan nor was a fall risk assessment performed until after he experienced the fall on October 15, 2022. Dkt. 75 at 3; Pl's Ex. C ¶ 22a., dkt. 73 at 41–42. More specifically, Mr. Huffman contends that Defendants' failure to maintain adequate nursing staff levels amounted to a widespread practice resulting in Hooverwood's failure to properly supervise his care, which deprived him of his right to reasonable accommodation under FNHRA.

Defendants have moved for summary judgment on Mr. Huffman's FNHRA claim on the grounds that no liability attaches to Defendants' actions because Mr. Huffman is unable to establish any of the three required elements under *Monell*. As we explain below, we share the view that Mr. Huffman has failed to establish the three required *Monell* elements that would have entitled Plaintiff to recover on his FNHRA claim. Accordingly, summary judgment in Defendants' favor is warranted.

## DISCUSSION

As a skilled nursing facility, Hooverwood is subject to the requirements of FNHRA, which federal statute "ensures that nursing homes that receive Medicaid funding respect and protect their residents' health, safety, and dignity." *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 171 (2023). As we ruled in our Order granting in part Defendants' Motion to Dismiss, subsection 1396r(c)(1)(A)(v)(I) of FNHRA creates an individually enforceable right by nursing home residents "to reside and receive services with reasonable accommodation of individual

needs and preferences, except where the health or safety of the individual or other residents would be endangered . . . ." Dkt. 42 at 9.

Hooverwood is owned and operated by Hancock Regional Hospital, a municipal entity under Indiana law, making Mr. Huffman's § 1983 claim reviewable under the standards of *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). The Jewish Home, which manages Hooverwood's day-to-day operations, is a private entity; well-established precedent provides that § 1983 liability can be established where such a private entity has contracted with the government and acted under color of state law. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). Mr. Huffman frames his legal theory within the *Monell* structure, and Defendants have not challenged that strategy. Therefore, for purposes of summary judgment, we shall treat Hancock Regional Hospital and the Jewish Home as appropriately sued defendants in this lawsuit.

For *Monell* liability to attach to Defendants, Mr. Huffman must be able to "trace the [alleged] deprivation of a federal right to some municipal action" committed by them. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022) (citation omitted). A municipal action can take the form of "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled, or (3) an official with final policy-making authority." *Monell*, 436 U.S. at 690. A plaintiff must then establish that the municipality acted with "deliberate indifference, [which is] a high hurdle to clear." *Stockton*, 44 F.4th at 617. Finally, a plaintiff must establish that the municipal action was the "moving force" behind the injury, requiring "a direct causal link between the challenged municipal action and the violation . . . ." *Dean v. Wexford Health Sources, Inc.*, 18

F.4th 214, 236 (7th Cir. 2021) (internal quotations omitted). Defendants challenge the existence of any and all of these three elements. We address each argument below.

**A. Municipal Action**

Mr. Huffman has made no attempt to show that Defendants acted either pursuant to an express policy or that the violation he suffered was caused by a final municipal policymaker. Instead, Mr. Huffman argues that Defendants' *Monell* liability arises from their widespread policy or custom of understaffing, which involved their failure to maintain adequate nursing staff levels, pursuant to their widespread practice. This practice deprived him of his right to a reasonable accommodation of his individual needs and preferences under FNHRA. Caselaw reveals that widespread policy can take the form of a municipal "practice or custom that, although not officially authorized, is widespread and well settled." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). This is how Mr. Huffman frames his cause of action.

We begin by noting that which the record evidence adduced here along with the parties' briefs reveal a factual dispute between the parties regarding the adequacy of Hooverwood's staffing levels during Mr. Huffman's brief stay in that facility, it is not a dispute that rises to the level of being a material fact in controversy. In arguing that Hooverwood was understaffed, Mr. Huffman relies on data from the Center for Medicare and Medicaid Services Payroll Based Journal ("PBJ") reflecting quarterly, facility-wide staffing data, "as opposed to hallway, or wing, or room-specific staffing data." Lewis Dep. 66:9-15, dkt. 92-2 at 15. The PBJ data applicable to Hooverwood reports that its certified nursing aide hours fell below the minimum amounts researchers have found appropriate to ensure proper supervision of residents. Dkt. 74 at 9. The PBJ data also indicates that during Mr. Huffman's stay at Hooverwood, the staffing average was

2.28 certified nurse aide hours per person per day, which was below the 2.80 hours per person per day found by researchers[5] to be the minimum number of staffing hours needed "to ensure timely and adequate care to nursing home residents." *Id.* Pl's Ex. A, dkt. 73 at 18–20, 74 ¶ 58. According to Mr. Huffman, the PBJ data demonstrates that Hooverwood "was below the national average and required certified nurse aide hours for 8 days and below the number of Registered Nursing and other Nurse hours for 78 and 70 days of the quarter, respectively." *Id.* at 4.

Defendants counter with competing facts in the form of the deposition testimony of Brittany Gonzalez ("Ms. Gonzalez"), an Administrator at Hooverwood, and Amelia Wallen ("Ms. Wallen"), the Assistant Director of Nursing at Hooverwood. Both opine that staffing levels at Hooverwood were sufficient. Ms. Gonzalez, whose administrative duties included the submission of the Hooverwood PBJ data each quarter to the government regulators, testified that Hooverwood's staffing levels "exceeded [its] competitors." Gonzalez Dep. 42:5-9, dkt. 69-3 at 4. Further, to the extent the PBJ data indicated that Hooverwood was below the national average for nursing hours, she attributed that finding to "an error in submission . . . ." *Id.* at 45:11-21. Ms. Wallen opined that apart from this statistical data she never had any reason to regard Hooverwood's staffing levels as below required levels. Wallen Dep. 55:17-19, dkt. 69-4 at 6.

Whether this dispute regarding Hooverwood's staffing levels during Mr. Huffman's stay suffices to establish a widespread practice, it falls short of satisfying the elements of a *Monell*

---

[5] The recommendation that a facility must have an average of at least 2.80 certified nurse aide hours per person per day comes from a 2016 simulation study published in the Journal of the American Medical Directors Association. Dkt. 73 at 73 ¶ 55, 74 ¶ 58. Mr. Huffman's expert witnesses refer to this data point as the minimum average nurse aid hours per person per day needed to provide appropriate care to residents. *See, e.g.*, dkt. 73 at 74 ¶ 58 ("Hooverwood averaged just 2.28 CNA HPPD during Mr. Huffman's stay in October 22, and well below 2.80 HPPD, the lowest level recommended in the research study.").

claim because it does not establish that Defendants acted with deliberate indifference to the purported widespread policy, as we explain next.

**B. Deliberate Indifference**

"Identifying municipal action—or, as it were, inaction—is only part of the requisite inquiry under *Monell*." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 379 (7th Cir. 2020). A plaintiff arguing that a defendant had a widespread policy or custom that is not unlawful on its face must prove that the municipal entity was on notice that said custom or policy would cause a rights violation and then acquiesced to the risk. *Id. See also Dean*, 18 F.4th at 235 ("If a municipality's action is not facially unconstitutional, the plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences.").

Understaffing as such is not the rights violation Mr. Huffman complains of. Rather, he contends that Defendants' alleged widespread practice of understaffing prevented Hooverwood from providing him with reasonable accommodation of his needs and individual preferences under FNHRA. Therefore, our analysis of deliberate indifference focuses on whether Defendants were on notice that Hooverwood's alleged widespread under-staffing levels would violate residents' right to have their needs reasonably accommodated. For the reasons explained below, we conclude that they were not.

When a custom is not violative of a federal right, the plaintiff must show that the defendant engaged in the practice with deliberate indifference. *Ruiz-Cortez v. City of Chicago*, 931 F.3d, 592, 589 (7th Cir. 2019). As staffing levels below 2.80 hours are not unlawful, Mr. Huffman must show a prior pattern of similar rights violations arising from Defendants' custom and practice of understaffing. *Dean*, 18 F.4th at 236 ("[A] plaintiff seeking to hold a municipality

liable for a facially lawful policy generally must prove a prior pattern of similar constitutional violations resulting from the policy."). To establish deliberate indifference to the unlawful effects of Defendants' purported widespread practice of understaffing, Mr. Huffman must be able to adduce evidence of other Hooverwood residents whose right to reasonable accommodation was also denied due to inadequate staffing.

Mr. Huffman's reliance on staffing data accrued during his stay, without connecting it to any other resident injuries, ultimately dooms his legal theory underpinning this lawsuit. Absent evidence of similar injuries suffered by other residents, Mr. Huffman's injuries, standing alone, are not a sufficient basis on which a jury could reasonably determine that Defendants "approved, acquiesced, or encouraged" a policy of understaffing that led to residents being denied the right to have their individual needs effectively accommodated. *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008). Even if the PBJ staffing data were to demonstrate that Hooverwood was understaffed during the period of Mr. Huffman's care, the alleged understaffing has not been tied to any other incidents involving potentially avoidable resident injuries. *See Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 675 (7th Cir. 2009) ("If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer there is a policy at work."). Indeed, Mr. Huffman has adduced absolutely no evidence of similar injuries being suffered by Hooverwood's other residents caused by understaffing.

Further, this is not one of the rare instances in which a single violation gives rise to a finding of deliberate indifference.[6] The Supreme Court has found in a very narrow set of

---

[6] Citing Hooverwood's failure to provide him with an individualized care plan and fall risk assessment, Mr. Huffman argues that Defendants were deliberately indifferent towards his rights. They "knew of [his] serious fall risk[,] knew that their staffing levels and supervision practices were inadequate to address that risk, and consciously chose to continue those inadequate practices." Dkt. 74 at 17. The staff also failed to provide him with increased supervision after

circumstances that deliberate indifference can be inferred when the violation of rights is a "highly predictable consequence of the municipality's failure to act." *Woodward v. Corr. Medical Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. 397, 490 (1997)). This narrow circumstance is not present here. The risk of a FNHRA violation for failure to provide reasonable accommodation was not "so high" or the need for more staff "so obvious" that Defendants' "failure to act can reflect deliberate indifference and allow an inference of institutional culpability . . . ." *J.K.J.*, 960 F.3d at 380.

The Seventh Circuit has also required plaintiffs pursuing *Monell* claims based on claims involving understaffing to point to others similarly harmed. *See, e.g., Stockton*, 44 F.4th at 618 (finding that a facility's struggles in maintaining adequate staffing levels, without evidence of other injuries, was not enough to support a finding of deliberate indifference). Indeed, our own court recently found in a case involving similar facts that understaffing, without evidence of other residents' injuries, was not enough to warrant *Monell* based relief under FNHRA. *See Godfrey v. Health & Hosp. Corp. of Marion Cnty. et al.*, No. 1:24-cv-00556-JHP-MJD 2026 WL 2936651, at *4 (S.D. Ind. Sept. 30, 2026) ("[E]vidence of understaffing, standing alone, does 'not adequately support a claim for *Monell* liability.' ") (quoting *Stockton*, 44 F.4th at 618). We therefore hold, consistent with these precedents, that Mr. Huffman's injuries, standing alone, do not establish deliberate indifference.

---

multiple notations by nurses that he was confused and posed a fall risk. Dkt. 74 at 13–17. These allegations are not tied to any evidentiary proof in the record. In any event, Mr. Huffman has waived the argument that his rights violation, standing alone, is enough to establish deliberate indifference. In his brief opposing Defendants' Motion for Summary Judgment, Mr. Huffman describes this case as not being one where an isolated incident gives rise to a constitutional violation, because, he says, there were "systemic constitutional violations affecting multiple individuals." Dkt. 74 at 10. Even so, he has provided no evidence of any other individuals who were purportedly harmed by Hooverwood's understaffing.

One final argument raised by Mr. Huffman warrants discussion. As an alternative to proving Defendants' deliberate indifference through evidence of other similar violations, Mr. Huffman maintains that Defendants were on notice that their staffing levels were inadequate during facility administrators' process of inputting the PBJ data. Dkt. 74 at 8–9. Mr. Huffman cites no precedent approving this approach or any evidence beyond the deposition testimony from Ms. Gonzalez attesting to the fact that she was the one who submitted the PBJ data on behalf of Hooverwood. Mr. Huffman contends simply that, because Ms. Gonzalez submitted the PBJ data, she also knew and accepted the inadequacy of Hooverwood's staffing levels. Despite the thin reed of logic on which this theory hangs, we stress that the issue here is not whether Defendants' decisionmakers acquiesced to the staffing levels, but whether they acquiesced to a level of understaffing that they knew would deny the residents the residents' right to be reasonably accommodated. The record reveals no evidence of any decision maker at Hooverwood, never mind Ms. Gonzalez, knowing that understaffing existed and/or that risks from said understaffing inhered. Recall that Ms. Gonzalez testified that, from her perspective, staffing levels at Hooverwood were adequate. Gonzalez Dep. 72:7-10, dkt. 69-3 at 10. Facility administrators inputting the PBJ staffing data were not thereby put on notice that staffing levels were sufficiently reduced so as to create an unreasonable risk that residents would be denied their right to a reasonable accommodation under FNHRA standards.

Accordingly, Plaintiff has failed to satisfy the *Monell* requirements by failing to establish that Defendants had adopted a widespread policy or practice of understaffing and/or that Defendants acted with deliberate indifference to the harms caused by such a policy. Having so determined, we need not reach the parties' remaining arguments regarding causation.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is **GRANTED**. Dkt. [69]. All pending motions are hereby **DENIED as moot**.

Final judgment shall issue accordingly.

IT IS SO ORDERED.

Date: 11/10/2026

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Robert Daniell
Smith Clinesmith, LLP
rdaniell@fightingelderabuse.com

Nicola Natasha Gray
Smith Clinesmith, LLP
nicola@fightingelderabuse.com

Lindsay A. Llewellyn
Riley Bennett Egloff LLP
lllewellyn@rbelaw.com

Bradley Needham
Smith Clinesmith, LLP
bneedham@fightingelderabuse.com

Katie R. Osborne
RILEY BENNETT EGLOFF LLP
kosborne@rbelaw.com

Jacob Runyon
Smith Clinesmith, LLP
jacob@fightingelderabuse.com